## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

UNITED STATES OF AMERICA,

      Plaintiff,

                                 Case No. 03-80504

v.

                                 Honorable Arthur J. Tarnow

KENNETH J. GRAHAM, et al.,         United States District Judge

      Defendants.

_____/

### OPINION AND ORDER DENYING DEFENDANTS' MOTIONS
### FOR NEW TRIAL [144, 146]

### I.  INTRODUCTION

On August 12, 2004, a jury convicted Defendants, Kenneth Graham and Kyle Dresbach, of conspiracy to subscribe false tax returns and to commit mail fraud and money laundering, and the substantive offenses of money laundering and subscribing false tax returns.  Defendants have filed motions for new trial.  The Court heard oral argument on February 23, 2005, after which it took the motions under advisement.  Having reviewed the record and applicable law, the Court **DENIES** both motions.[1]

_____

[1]Remaining before the Court is the government's motion for preliminary order of forfeiture. The Court has heard argument on this motion and will issue a ruling at the time of sentencing.

*USA v. Graham, et al.*
03-80504

## II.  FACTS AND PROCEDURAL HISTORY

On May 20, 2003, the government indicted Graham and Dresbach for conspiracy to commit mail fraud and file false tax returns; conspiracy to commit money laundering; money laundering; and subscribing false tax returns.  The government filed a superseding indictment on September 18, 2003. The crux of the government's case was that Graham and Dresbach conspired to defraud Thyssen, Inc., N.A., a steel processing company headquartered in Detroit, Michigan, of $6.5 million dollars in a "kickback" scheme spanning more than a decade.[2]  The government asserted that Defendants caused Thyssen to enter into agreements to purchase machinery (cranes and slitting machines) at fraudulently inflated prices. The inflated prices resulted in higher commissions for an equipment broker, who then funneled the excess commissions to Graham, Dresbach, and Jerome Allen, the former attorney for Defendants and Thyssen and an un-indicted co-conspirator.[3]

A jury trial began on July 22, 2004.  The intricacies of the scheme, as laid out by the government, were as follows:  Graham and Dresbach had their equipment suppliers, Ranez Equipment and Chicago Slitter, inflate their invoices in

---

[2]Graham and Dresbach were founders of the company which merged into Thyssen.  Graham is a former CEO of Thyssen.  He retired in 2001.  Dresbach was Thyssen's Executive Vice-President.  He resigned in December 1996.

[3]Allen pleaded guilty in a separate case and is awaiting sentencing.

-2-

*USA v. Graham, et al.*
03-80504

order to pay commissions to a consultant, Hurricane Machine.  Hurricane was run by Robert Murdock, who paid the commissions, as well as monies obtained from Thyssen for fictitious consulting fees, to one of more than a dozen shell entities created by Allen.  From those commissions, Allen wrote checks to Graham and Dresbach, and converted portions for his own use.  He also helped conceal the money and filed false tax returns on behalf of Graham and Dresbach.

On August 12, 2004, the jury convicted Graham and Dresbach of all counts charged in the superseding indictment.

### III.  DISCUSSION

### A.  Defendant Graham's Motion for New Trial, Renewal of Prior Motions, and Dismissal

Graham's motion for new trial is based upon fifteen boxes of financial and legal documents which were produced by Allen, the government's principal witness, after the government concluded its case-in-chief.  As will be discussed below, Graham's theory of defense was two-fold:  (1) he had a cash hoard which had accrued prior to the years charged in the indictment, and (2) he had loaned large sums of money to Allen in the late 1980s and early 1990s but had no promissory notes to evidence those loans.

He argues here that the government violated *Brady v. Maryland,* 373 U.S. 83 (1963), by failing to produce the files sooner.  Further, the suppression of the

-3-

documents during the trial compromised his Sixth Amendment right to confront

the witnesses against him and his Fifth Amendment right to a fair trial.  Graham

also argues the 40,000-plus documents contained in the fifteen boxes constitute

newly discovered evidence under Rule 33 of the Federal Rules of Criminal

Procedure.  If he had known about the files well in advance of trial, he insists, he

would not have relinquished his Fifth Amendment right to remain silent by taking

the witness stand.  Nor would the government have called his first wife, Norine

Graham, as a rebuttal witness.  Finally, Graham argues that the Court erred in re-

instructing the jury after it had reached a verdict.

## 1.  Entitlement to New Trial Under *Brady*

Due process prohibits the government from suppressing evidence which is

favorable to an accused and material to guilt or punishment.  This prohibition

applies to both exculpatory and impeachment evidence.  *Mason v. Mitchell,* 320

F.3d 604, 628 (6th Cir. 2003) (citing *Brady,* 373 U.S. 83)).  However, "not every

failure to disclose evidence favorable to the defense requires a reversal of a

conviction."  *Schledwitz v. United States,* 169 F.3d 1003, 1011 (6th Cir. 1999)

(quoting *United States  v. Veksler,* 62 F.3d 544, 550 (3d Cir. 1995)).

When a defendant asserts that newly discovered *Brady* evidence is

exculpatory and seeks a new trial on that ground, the defendant must show that

(1) the prosecutor suppressed the evidence; (2) the evidence was favorable to the

USA v. Graham, et al.
03-80504

defense; and (3) the evidence was material. *Moore v. Illinois,* 408 U.S. 786, 794-

95 (1972). In conducting a materiality analysis, "the question is not whether the

defendant would more likely than not have received a different verdict with the

evidence, but whether in its absence he received a fair trial, understood as a trial

resulting in a verdict worthy of confidence." *Schledwitz,* 169 F.3d at 1011

(quoting *Kyles v. Whitley,* 514 U.S. 419, 434 (1995)). This requirement is not a

sufficiency-of-the-evidence test. *Id*. at 1012 (citing *United States. v. Smith,* 77

F.3d 511, 515 (D.C. Cir. 1996)). Any favorable evidence is material if "there is a

reasonable probability that, had the evidence been disclosed to the defense, the

result of the proceeding would have been different." *Id.* (Quoting *Kyles,* 514 U.S.

at 433-34)). A "reasonable probability" is "a probability sufficient to undermine

confidence in the outcome." *Id.*

### a. Did the prosecution suppress the fifteen boxes of Allen files?

Graham asserts that, approximately one year prior to the start of trial, he

asked Allen to turn over all files in his possession pertaining to him. Allen

produced a total of five boxes on June 11, 2003, and October 5, 2003, telling

Graham that he had given him all records in his possession. On March 15, 2004, a

government agent, memorializing an interview with Allen, noted:

> "Haven't turned over old files, 1980s, to Graham's attorney. We want
> to review them first."

-5-

*USA v. Graham, et al.*
03-80504

On June 29, 2004, the prosecutor sent a letter to Graham's attorney, explaining that the notes pertaining to the Allen interview were enclosed. Graham's attorney received the letter – minus the enclosures – on July 1, 2004. He informed the prosecutor of the missing enclosures during the final pretrial conference on July 19, 2004. On July 20, 2004, the day on which trial was scheduled to begin, the Court granted a two-day adjournment.

On July 22, 2004, prior to the commencement of opening statements, Graham moved to dismiss the indictment based on governmental misconduct and violations of the Fifth Amendment and *Brady*. The motion was based on the fact that the 1980s files mentioned in the March 15, 2004, letter had not been turned over to him. The Court denied the motion.

On the evening of August 5, 2004, the prosecutor notified Graham's attorney that Allen had delivered to him four promissory notes from the early 1990s. On Friday, August 6, 2004, Graham moved for mistrial. The existence of the notes, he argued, undermined his theory that Allen destroyed any evidence of loans from him. On that day, the Court and Graham learned of the existence of a box containing files kept by Allen and pertaining to Graham. The Court took the motion under advisement and urged the parties to attempt a stipulation regarding the documents over the weekend.

The hearing on Graham's motion for mistrial resumed on August 9, 2004.

-6-

Graham's attorney informed the Court that eighteen (in actuality, fifteen) boxes of Allen's documents were delivered to Defendants over the weekend, and it would take months to figure out which, if any, of the documents were relevant. The Court denied the motion for mistrial on the basis that there was no evidence of concealment by the government.

Graham now argues that, once the government realized on March 15, 2004, that Allen had files pertaining to Graham in his possession, there arose an affirmative duty on the part of the government to send agents to search the location where the files were kept. The government responds that, sometime after March 15th, it received several records from Allen. The government gave those records to Graham's attorney. The government insists it had no way of knowing that Allen had fifteen boxes remaining in his possession. Further, the indictment did not charge Defendants with illegalities occurring in the 1980s; thus, the government had no reason to assume that the files from the 1980s would be relevant. The government did not review any records other than those provided to the defense.

Neither party has cited any cases which have extended, or declined to extend, *Brady* to evidence which is in the exclusive control of a cooperating witness and of which the government's knowledge is not certain. Of the cases cited by Graham, he relies most heavily on *Kyles,* 514 U.S. 419. The *Brady* issue presented there was whether the State of Louisiana could be held accountable for

*USA v. Graham, et al.*
03-80504

evidence known only to the police investigator and not to the prosecutor.  The Supreme Court held that *Brady* imposes upon the individual prosecutor "a duty to learn of any favorable evidence known to others acting on the government's behalf in the case, including the police."  *Id.* at 438.

*Kyles* is not dispositive.  Cooperating witnesses such as Allen stand in a very different position than do police officers and other governmental agents.  Moreover, the Court is not convinced that the government knew or should have known of the existence – or contents – of the fifteen boxes of files.  Since Allen supplied the government with a few additional records after March 15, 2004, the government could have reasonably concluded that it had received all of Allen's files.

"Suppression" under *Brady* denotes either actual or constructive possession by the government.  *See, e.g., United States v. LaRouche Campaign,* 695 F. Supp. 1290, 1295 (D. Mass. 1988).  Evidence is not "suppressed" when it is readily available to the defendant from other sources.  *United States v. Mullins,* 22 F.3d 1365, 1371 (6th Cir. 1994).  Graham had the same access to the Allen files as did the government.  If there was a suppression in this case, it was Allen's doing, not that of the government, and *Brady* does not extend to his activity.

### b.  Is the evidence favorable and/or material?

-8-

*USA v. Graham, et al.*
03-80504

Since there was no suppression by the government, Graham cannot establish a *Brady* violation even if the evidence is material.  The Court must, nonetheless, discuss materiality, since Graham has also invoked Rule 33, which gives district courts discretion to grant a new trial "if the interest of justice so requires."  *Brady's* materiality standard is slightly more relaxed than that imposed by Rule 33.  If Graham cannot establish materiality in the *Brady* sense, he cannot establish materiality for purposes of Rule 33.

The superseding indictment charged Defendants with conspiracy to subscribe false tax returns and to commit mail fraud, in violation of 18 U.S.C. § 371; conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h); money laundering, in violation of 18 U.S.C. § 1957; and subscribing false tax returns, in violation of 26 U.S.C. § 7206(1).  To prove Graham's taxable income, the government relied on the "cash method" of proof, which is an indirect method.  The government had the burden of proving a likely source of taxable income.  *See, e.g., United States v. Bencs,* 28 F.3d 555, 563 (6th Cir. 1994).

At the hearing in February 2005, the government asserted that it had no duty to disprove all potential sources of nontaxable income.  Graham responded that "[t]he law requires [the government] to negate the other source in order to make their likely source likely."  Contrary to Graham's assertion, the government was not required to negate or disprove all possible sources of nontaxable income.  *See*

-9-

*id.* ("Proof of a source of taxable income carries with it the negation of untaxable income."). *See also United States v. Massei,* 355 U.S. 595, 595 (1958), and Edward J. Smith, *Methods of Computing Taxable Income,* 15 Mertens Law of Fed. Income Tax'n § 55B:49 (explaining that, under the cash method of proof, the government must demonstrate a likely source for unreported income *or* negate all reasonably possible nontaxable sources).

Graham's two-pronged defense was that he had accumulated substantial amounts of cash prior to the years charged in the indictment (cash hoard), and he had loaned money to Allen in the past. The alleged kickbacks, then, were simply repayments by Allen. At the time of trial, Graham did not have documents to substantiate his defense. He argues now that the evidence contained in the newly discovered Allen files would have substantiated his defense without the need for his testimony or that of his ex-wife.

### i. *The evidence presented by the government at trial.*

The government met its burden of proving that Graham had a likely source of taxable income. Indeed, the documentary and testimonial evidence presented by the government on all counts charged in the superseding indictment was overwhelming.

Allen testified that, in 1990, Graham approached him about a venture involving commissions from the sale of equipment to Thyssen. He and Dresbach

had already spoken to Robert Murdock.  Murdock would not agree to pay

commissions in cash but insisted upon getting an invoice; thus, Graham and

Dresbach needed Allen to form an entity to send invoices to Hurricane Machine.

Allen created T.H.A.T.S. and approximately a dozen other entities, most of which

were shell entities, to send invoices to Hurricane for fictitious consulting services.

Allen also testified that he did not report any of the Hurricane funds on

Defendants' tax returns.  The plan was that he would report the money on his own

returns.  However, most of the money went unreported.  For more than ten years,

he submitted phony invoices to Hurricane on behalf of entities which never

performed any services for Hurricane.

Allen further testified as to a very intricate scheme of receiving and

distributing the Hurricane proceeds among the three co-conspirators.  He stated

that Defendants did not want the money to be deposited into their accounts.  Thus,

he wrote checks to whomever Defendants wanted the money to be paid.  He

testified that he had an arrangement with the Grahams whereby he would write "re:

loan" on the captions of several of the checks he wrote on the Grahams' behalf.

The loans, he stated, never existed.  From 1994 until 2000, he made $1,077,959.92

in expenditures on Graham's behalf.

Faye Murdock, the wife of Robert Murdock and bookkeeper for Hurricane

for more than three decades, testified that Hurricane received consulting fees from

Chicago Slitter and Ranez even though Hurricane had no accounts for such fees.
She had no knowledge of Hurricane having received any consulting services.

Additionally, there was testimony by Thyssen's equipment sellers that they
placed a markup on proposed equipment prices or that they paid higher
commissions to Hurricane Machine for sales involving Thyssen than for sales not
involving Thyssen. For example, Richard Schwab, a former sales representative
for Ranez Equipment Sales, Inc., testified that a crane which would have cost
Thyssen $1 million actually cost $1,507,142 after a thirty percent markup at Robert
Murdock's behest. Witnesses testified that Graham and Dresbach were the
ultimate decisionmakers on the purchase of cranes and slitting machines.
Witnesses also testified that inflated equipment invoices, as well as checks from
Thyssen, were placed in the United States mails.

The government also presented testimony to the effect that Graham was
heavily involved in the construction aspects of Thyssen. Leonard Tajer, a retired
plant manager and inside salesperson for Thyssen, testified that Graham once told
him to re-quote a $5,000 bid which he thought was too high. Walter Oehler,
Thyssen's CFO, testified that, for several phases of Thyssen's expansion project,
Graham exceeded the budget allowed by the parent company. Nicholas Tolerico,
President of ThyssenKrupp Steel Services in South Carolina, testified that Graham
once ordered him to pay for a machine which was not working. He also testified

*USA v. Graham, et al.*
03-80504

that Graham had directed him to correspond with Murdock through him; he could not contact Murdock directly.

Numerous witnesses testified as to Graham's cash expenditures and the fact that Allen often wrote checks on Graham's behalf. Michael Zukowski, Thyssen's chef/bookkeeper at Britt Lodge in Jackson Hole, Wyoming, testified that Graham kept unspecified amounts of cash at the lodge. Brandon Stears, a landscaper, testified that Graham paid her $75,000 in cash for a $500,000 landscaping project at Britt Lodge in 1998. The cash was bundled in $5,000 increments comprised of $100 bills. Michael Stears, husband of Brandon Stears, likewise testified that Graham paid him $75,000 in $5,000 bundles. He was told not to say anything about the cash. Thomas Stoner, a building contractor who worked on Britt Lodge in 1998, testified that he, too, was paid in $5,000 cash bundles and that Graham told him never to tell that he was paid in cash.

Roy Wissel, the owner of Wissel Construction in Vero Beach, testified that, when he built the Grahams' $3 million residence, he received checks from both Allen and Graham. Graham also paid approximately $50,000 in cash, using $5,000 bundles, just as he used to pay other contractors. Wissel also testified that, after the Internal Revenue Service began its investigation, Graham advised him to keep quiet about the cash.

IRS Special Agent Michael Kaza testified that, in July 1999, he interviewed

-13-

*USA v. Graham, et al.*
03-80504

Thyssen's construction contractor – who had been selected solely by Graham – in his home. The contractor took Kaza into his basement and showed him a safe containing thirty-seven white, letter-sized envelopes, each containing $5,000 bundles of cash in $100 bills. Prior to the interview, Kaza had obtained the contractor's bank records, which indicated substantial cash withdrawals in 1997 and 1998. The withdrawals exceeded the amount of money spent by Graham in those years.

Paul Burns, proprietor of Evola Music, testified that Britt Marie Graham purchased three pianos from him in 1996. One of the pianos was a restored Steinway, which cost $33,900. Britt Marie told Burns the piano was for a client named Jerry Allen. Allen wrote the check. Francine McGuire, former president of Chelsea Antiques, Ltd., testified that she made out an invoice to Allen for antiques ordered by Britt Marie Graham.

Norine Graham, who was called as a rebuttal witness, testified that, during her twenty-year marriage to Graham, which ended in 1987, she had no knowledge of there being a safe in the couples' main residence. Nor did she have knowledge of Graham having brought large amounts of cash from Germany. Graham had previously testified, *inter alia,* that, in the 1980s, he brought approximately $650,000 in cash from Germany to the United States and kept it in safes at one of his three homes.

-14-

*USA v. Graham, et al.*
03-80504

### ii. What Graham argues the new evidence could have proven (or, could have prevented the government from arguing).

Graham first argues that the evidence contained in the Allen files, specifically, records from Commerzbank of Duesseldorf, Germany, would have bolstered his cash hoard defense by showing that he was paid substantial amounts of money (nearly $600,000) in Germany in the late 1970s and 1980s. The money, Graham asserts, earned eighteen percent interest. The records could have been used to confront Annette Skiba, Thyssen's Chief Accounting Officer, who testified that Thyssen did not pay any money to Graham in Germany.

The government responds that, absent evidence that Graham withdrew the money and brought it back to the States, the money in the German accounts is irrelevant. In reply, Graham cites an October 18, 1979, note by Allen, supposedly acknowledging that Graham withdrew $200,000 from a Commerzbank account to use in the United States. While the note, which is not fully legible, appears to show that $200,000 was withdrawn from a Commerzbank account, it is not clear that the funds were transferred to an account in the States, or that they were in fact brought to the States.

Graham also cites records which, he asserts, show that he received money from the sale of furniture and personalty in the 1980s and 1990s. The government responds that there is no evidence that Graham actually converted these assets to

-15-

cash. Although the records ostensibly indicate the value of furniture and personalty in Graham's possession in the 1980s and 1990s, there is no record of any sale having taken place or proceeds from a sale having been deposited in the bank. Thus, the Court is not persuaded that these documents, or the Commerzbank records, would have independently established a cash hoard defense.

Graham also argues that the Commerzbank records would have allowed him to impeach the testimony of Agent Kaza. Kaza testified about the cash method of proof with respect to the tax counts. His testimony, combined with numerous checks and flow charts, helped the government show the movement of the Hurricane proceeds through Allen's shell entities to Graham, Allen, and Dresbach. Kaza explained that the IRS considered twenty-five potential sources of cash for Graham. Among those sources was cash brought into the United States from another country. The IRS concluded that outside cash was not a likely source, since there were no Currency Monetary Instrument Reports to substantiate that likelihood. This Court is of the opinion that the Commerzbank records would have had little, if any, impeachment value, since there is no evidence that Graham actually brought the cash into the United States.

Next, Graham argues that the evidence contained in the Allen files could have substantiated his defense that he loaned money to Allen. He first cites a handwritten ledger, dated 1987, which shows a payment of $50,000 to Allen, along

with the words, "Repayment of loan." The government points out that the entry shows that Graham was repaying money loaned by Allen, not vice versa. This Court is of the opinion that the ledger entry is ambiguous and would not necessarily have substantiated Graham's defense of loans to Allen.

Graham also cites four unsigned promissory notes which Allen executed in favor of Britt Marie Graham in the early 1990s. The notes total $200,000. Additionally, there is a handwritten note which shows that Allen paid money to Britt Marie Graham "for deal." Mrs. Graham testified that she did not loan any money to Allen. (Of course, Graham argues that she would not have testified if the promissory notes had been available.) The notes were submitted into evidence. Allen was recalled by Graham to testify about the notes, and, during cross-examination by the government, he stated that the notes were merely a ruse. Thus, the jury had the opportunity to consider the notes as impeachment evidence. Apparently, the jury was not persuaded that the notes were probative in the sense argued by Graham.

Next, Graham asserts the new evidence would have allowed him to impeach Allen's testimony regarding a 1996 financial statement which listed accounts receivable due to the Grahams. The specific evidence to which he refers includes 1994 and 1988 financial statements from two institutions, showing accounts receivable from various sources in the amounts of $75,000, $4,000, and $90,000.

*USA v. Graham, et al.*
03-80504

The government theorized that the line-item on the 1996 financial statement was false and intended to provide Graham with security to collect kickbacks owed to him by Allen in the event of Allen's death. Graham asserts that the 1994 and 1988 financial statements would have refuted the government's contention that the inclusion of the receivables on financial statements was for the reason argued by the government.

The government responds that this evidence is cumulative and irrelevant. It is cumulative because a 1993 financial statement, with similar entries, was admitted into evidence. It is irrelevant because the amounts reflected are *de minimus* in comparison to the $1 million given to Graham by Allen.

A related argument is that the new evidence contains financial statements and credit applications which were signed in blank by the Grahams. Graham testified that he gave the blank forms to Allen, who typed in the relevant information. The government attacked that assertion as false. The conclusion which this Court is asked to reach is that Allen, by filling in the blank forms, acted alone, rather than in concert with Graham and Dresbach, in carrying out the scheme.

The government responds that the blank credit applications would not have impeached Allen, because his testimony was that he prepared financial statements reflecting notes receivable to protect Graham in the event he died with Graham's

-18-

Hurricane proceeds in his possession.  This Court is of the opinion that the impact of the 1994 and 1988 bank records, and the forms signed in blank, if any, would have been minimal.  That Graham signed the forms in blank does not automatically give rise to an inference that he was ignorant of the forms' content.

Finally, there are other documents which, Graham asserts, would have substantiated his defense without the need for his testimony:

- Allen's 1980 notes reflecting Graham's instructions to liquidate investment holdings and transfer money to Graham.

- 1979 files from EF Hutton showing $250,000 in deposits from 1975 through 1979 and $92,000 in withdrawals.

- A January 17, 1992, Comerica Mortgage on Graham's Scenic Oaks residence, in the amount of $150,000.

- Documents showing $631,000 in proceeds from the sale of Florida property.

- A July 10, 1974, Manufacturer's Bank CD purchase receipt for $530,000.

- A November 25, 1974, First National City Bank Settlement Statement showing Graham's receipt of $412,681 from Nedco, Inc.

- A November 18, 1974, receipt for $502,833 from related shares from Nederlander.

- Allen's October 18, 1979 handwritten notes showing knowledge of an account in Graham's name at Commerzbank exceeding $200,000, and noting that Graham was making withdrawals from the account.

*USA v. Graham, et al.*
03-80504

- A handwritten draft letter to Dr. Kriwet of Thyssen in Germany, supposedly supporting Graham's claim that he had a 10% stake in profits and that he received payment of such as compensation in Germany.

- A 1987 loan from Comerica Bank for $150,000, supposedly used to pay $100,000 to Norine Graham.

- A May 18, 1998, acknowledgment receipt and release relating to $290,000, which was paid to Graham from an insurer after a fire at his Martel residence.

- A sale contract for Graham's Lost Tree home establishing a sale of personal property.

- Letters explaining that some of the furnishings sold were to be retained and reimbursing the proceeds.

- September 21, 1986, handwritten notes reflecting proposals on the sale of the Lost Tree residence as a cash transaction.

- An August 31, 1981, Detroit Bank and Trust Statement showing a balance of more than $143,000, after $140,000 in cash withdrawals over two months.

- Handwritten tabular analysis ostensibly listing Graham's assets and liabilities, showing Allen as an asset and amounts of $70,000 and $50,000.

- A letter to an insurance company signed by Allen in 1993, confirming coverage of Johns Island condominium contents of $100,000.

- 1996 notes by Allen regarding the sale of the Johns Island condominium and showing a furniture value of $175,000.

- 1994 Merrill Lynch deposit records showing a $500,000 deposit to the account of Britt Marie Graham.

In addition to the arguments set forth above, Graham argues that the government would not have been able to cross examine him in a "mocking and sarcastic tone;" nor would the government have been able to tell the jury that Graham's cash hoard defense was a "fantastic story."

In this Court's view, the deficiencies in Graham's reliance on this evidence are that (1) some of the items, for example, the ledger which purportedly evidences loans made to Allen by Graham, are too uncertain to have substantiated Graham's defense without the need for his testimony; and (2) he has no evidence of cash transfers. While the government has cited no authority requiring Graham to show a literal stockpile of cash, a cash hoard typically consists of an accumulation of cash which is not kept in a bank. *See, e.g.,* Edward J. Smith, *Methods of Computing Taxable Income,* 15 Mertens Law of Fed. Income Tax'n § 55B:49. *Cf. Thomas v. Commissioner of Internal Revenue,* 223 F.2d 83 (6th Cir. 1955) (cash hoard found in safety deposit box on the death of a taxpayer). It seems axiomatic that, if such hoard existed, Graham would, at the least, have evidence of cash transfers, even if he had no evidence of a literal cash pile.        The relevant inquiry under *Brady* is whether, in the absence of the evidence discovered in the Allen files, he received a fair trial. This Court's confidence in the fairness of the

*USA v. Graham, et al.*
03-80504

trial and in the verdict rendered by the jury has not been undermined by the newly

discovered evidence. Therefore, the Court concludes that Graham is not entitled to

a new trial under *Brady*.

## 2. Entitlement to New Trial Under Rule 33

Rule 33(a) of the Federal Rules of Criminal Procedure provides that a court

"may vacate any judgment and grant a new trial if the interest of justice so

requires." Such motions are often based on newly discovered evidence.[4] To obtain

a new trial based on newly discovered evidence, a defendant must show that the

evidence (a) was discovered after the trial; (b) could not have been discovered

earlier with due diligence; (c) is material and not merely cumulative or

impeaching; and (d) would likely produce an acquittal. *United States v. Hawkins,*

969 F.2d 169, 175 (6th Cir. 1992).

### a. *Was the evidence discovered after the trial?*

Here, the evidence was discovered prior to the end of trial. However, the

Court directed Graham to review the material and, if it included exculpatory

evidence, file a motion for new trial after the verdict. Thus, this element is

satisfied.

---

[4]Graham cites section 33(b)(1) of Rule 33 of the Federal Rules of Criminal Procedure. Section 33(b)(1) sets forth the time limit for filing a motion for new trial based on newly discovered evidence. Section 33(a) sets for the grounds for a new trial: when the "interest of justice so requires."

*USA v. Graham, et al.*
03-80504

### b. Could Graham have discovered the evidence sooner?

On June 29, 2004, the government mailed Graham's attorney a letter
pertaining to the March 15, 2004, memorandum of an interview with Allen.
Graham's attorney received the letter on July 1, 2004, but the memo was missing.
He did not inform the government of the missing enclosure until the eve of trial.
Although Graham insists that the burden was on the government to produce the
Allen files, the Court is not persuaded by Graham's argument that he could not
have discovered the files sooner with due diligence.

### c. Is the evidence material and would it have likely produced an acquittal?

Although Rule 33's materiality standard is distinct from *Brady's,* the Court
concludes that, because Graham has not satisfied *Brady's* materiality standard, he
cannot satisfy the standard imposed by Rule 33.  Therefore, his request for a new
trial under this Rule must likewise be denied.

## 3.  The Privilege Against Self-Incrimination

Graham asserts that, if he had known of the existence of the fifteen boxes
prior to trial, he would not have surrendered his Fifth Amendment right against
self-incrimination by taking the witness stand.  For the reasons discussed above,
the Court is of the opinion that, even if the Allen files had been known to Graham
prior to trial, the records would not have been a sufficient substitute for his

-23-

*USA v. Graham, et al.*
03-80504

testimony.  Thus, this argument is unpersuasive.

## 4.  Joinder by Defendant Dresbach

Dresbach argues that, if the fifteen boxes of Allen files had been disclosed to the defense prior to trial, he would have testified.  He asserts that he declined to testify because Graham was effectively "skewered" by the prosecution.  However, had the evidence been disclosed prior to trial, he could have used it to impeach Allen's testimony in a material way.  He further asserts that he could have used the evidence to prove that he was not a party to the conspiracy.  The Court agrees with the government that the evidence contained in the Allen files, which pertained only to Graham, would not have bolstered Dresbach's case.  The argument that he passed on the opportunity to testify after witnessing the government's handling of Graham is without merit.

## 5.  The Court's Re-Instructing the Jury

Finally, Graham argues that the Court violated Rule 30(c) of the Federal Rules of Criminal Procedure by issuing the following supplemental instruction after the jury announced that it had reached a verdict:

> If the government fails to prove that an overt act occurred after May 20, 1998, then Mr. Graham and Mr. Dresbach cannot be convicted of the conspiracies charged in Counts 1 and 2, because the statute of limitation has run, and you must find them not guilty.  Therefore, before you can return a verdict of guilty on Counts 1 and 2 for either Mr. Graham or Mr. Dresbach, you must unanimously agree that at least one overt act was committed after May 20, 1998.

-24-

*USA v. Graham, et al.*
03-80504

The following exchange preceded the giving of the instruction:

[The Government]:   Your honor, . . . I think there is an
inconsistency between the jury instructions and the verdict form, in
that the verdict form asks the jury to list all the overt acts that it finds;
whereas, the instructions say that they only have to find one.

The Court:   Well, that's not inconsistent.  If they find
more than one, as long as they find one, it is from your point of view.

[The Government]:   Well, but I mean there's only about
a half inch of space after that question.  And I was just wondering if
that's going to create any appellate issues that maybe the Defendants
can waive.

* * *

[The Government]:   . . . Let me just for the record state that
when I gave my rebuttal argument, I was under the impression, the
faulty impression that they only had to find one overt act.  And I
specifically asked them to find an overt act that went past May 20,
1998.  Now, I don't know if that is going to create an issue or not, that
the jury instructions say you only need to find one overt act.  If they
put down an overt act before May 20, 1998, does that mean that their
guilty verdicts, if they are guilty verdicts, won't withstand appellate
review.  That's my question.

The Court:   The answer is they won't withstand my
review.  But there's room for them to put down more than one overt
act.

I mean ideally you would have had all of the possible ones
listed there and check yes or no, which you've done in a different part
of it.  But I think there's room to do it and –

-25-

[The Government]:   Well, my main concern is that you have not instructed them that if they do not find an overt act past May 20, 1998, that their verdict, if it is guilty, will not withstand your review.

The Court:   What's the Defense view on this?

[Graham's Attorney]:   Well, it's not my client, but I think there is a jury instruction that talks about that very issue.

* * *

[Dresbach's Attorney]:   I just feel that if we put – if we revise this, which – everybody agreed to it.  If we revise this, it will put a super amount of emphasis on it.  And it just says specify which overt acts that – maybe if you want – if you would tell them, you know, if you have to write on the back, feel free, if there is not enough room.

[The Government]:   Well, I am asking for a short reinstruction to this jury, that although we have only asked them to find one, they have to find all of them.  And they have to write down all of them that is in the indictment if you want.  Otherwise, it will prejudice the Government.

* * *

[Graham's Attorney]:   Your Honor, I probably have not stated my position clearly.  And I'd like to.

My position is that I don't believe there is any ambiguity, and I believe that the jury verdict form as it presently exists is appropriate and should be continued in its current form.

And I would also add that I believe Your Honor provided a copy of the indictment to the jury.  I think you did.  And if you did, all of the overt acts are listed.  So, they don't need an addendum or list or

*USA v. Graham, et al.*
03-80504

anything.  They can look at the indictment.

The Court announced a recess and directed the government to prepare a proposed

instruction.  Following the recess, the discussion continued –

> The Court:   Okay.  The first case is one that I almost mentioned
> before lunch.  And it has to do with – well, the name of the case is
> <u>Reynolds versus Green</u> [184 F.3d 589 (6th Cir. 1999)].  And it has to
> do with a situation where the jury comes back and asks a question,
> and the trial judge does what I call the American [in] Europe rule.
> And that is he insists upon repeating the same wrong instruction
> because both parties had agreed to it.  And the Sixth Circuit said that
> was plain error.  When the jurors ask a question and say they are
> confused, you don't just say it louder and slower, expecting them not
> to be confused.
>
> How does this apply here?
>
> [Dresbach's Attorney]:   Well, Your Honor, the jury has not
> stated –
>
> The Court:   They haven't asked anything.
>
> [Dresbach's Attorney]:   Exactly.  So, therefore there's a –
>
> The Court:   Okay.  You don't want me to do anything then.
>
> [Dresbach's Attorney]:   Yeah, I don't want you to do anything.
>
> The Court:   Okay.  The other case is called <u>Wilson versus
> United States</u>, a Supreme Court case . . . .  What's your view on that
> case first [government]?
>
> [The Government]:   It is the dicta.  And it says that if there is
> an erroneous legal instruction, that if it's curable without prejudice

and without inefficiency, that it should be cured, even after the instructions have been given to the jury.

The government presented the proposed instruction, and Defendants objected on the grounds that, because the jury had already received instruction, the supplemental instruction would cause confusion and, therefore, prejudice; and the jury had not indicated that it was confused. Additionally, Defendant Dresbach argued that reinstruction would violate the double jeopardy clause by giving the jury the opportunity to change its verdict.

The Court continued:

> [I] do note the difference in the facts between the first case you cited, the <u>Reynolds</u> case. But I don't read that as barring, but, rather, encouraging the jury to have a correct statement of the law before they reach their verdict.

The Court concluded:

> All right. I've made my decision, and for the reasons that I have stated to [Graham's attorney], that there's two possibilities that I mentioned, which were if it is an acquittal, this isn't going to hurt you, and if it's not an acquittal, it gives you another chance. And the third possibility that [Graham's attorney] mentioned . . . which was, as I understand it, that it may be a signal to the jury to redo everything, I don't think that's going to happen. I think this is a very focused sixth line instruction.

The jury re-entered, and the Court gave the proposed instruction, asking the jury to continue its deliberations. Twenty-seven minutes later, the jury announced that it

*USA v. Graham, et al.*
03-80504

had reached a verdict.

Rule 30(c) states that a court "may instruct the jury before or after the arguments are completed, or at both times."  Graham argues that it was prejudicial to give a re-instruction to a jury which had already reached a verdict and had not indicated that it was confused or deadlocked.  The instruction, he insists, "unfairly and prejudicially emphasized to the jury that they had better find an over[t] act had occurred after May 20, 1998, or else the defendants would go free."

The Court disagrees.  The instruction simply cautioned the jury that it must not convict unless it found an overt act.  *Cf. United States v. Desimone,* 119 F.3d 217, 227 (2d Cir. 1997) (upholding instruction on reasonable doubt given after the verdict).  Graham has presented no evidence that the re-instruction caused the jury to change its verdict or consider acts outside of the relevant time period.  Thus, the Court will not grant a new trial on this basis.

### B.  Defendant Dresbach's Motion for New Trial

In his motion, Dresbach urges the Court to conduct a hearing pursuant to *Remmer v. United States,* 347 U.S. 227 (1954), to determine which exhibits actually went into the jury room.  His theory is that unauthorized exhibits were submitted to the jury.  *Remmer* hearings are generally conducted when a defendant can show that unauthorized juror contact "created actual juror bias."  *United States v. Yang,* 281 F.3d 534, 549 (6th Cir. 2002).  Dresbach raised this issue shortly after

-29-

the trial, and, at that time, he had no idea which extraneous exhibits might have gone before the jury. Having had the opportunity to question several of the jurors at the time of the motion hearing – which took place more than six months after the trial – he could make no offer of proof as to whether or which unauthorized exhibits were submitted to the jury. Thus, the Court declines to conduct the requested hearing.

Dresbach next argues that he is entitled to a new trial based on the absence of his trial attorney during a critical stage of the proceedings. The critical stage, he asserts, was the point at which the previously admitted exhibits were being discussed. He did not raise this argument in his initial brief. Rather, he raised it in a supplemental brief after the hearing. He concedes that he has no authority to support this proposition.

The Sixth Circuit has stated:

> Where the Sixth Amendment claim is the denial, rather than the ineffective assistance, of counsel, the criminal defendant need only show that counsel was absent during a critical stage of the proceedings in order to establish the constitutional violation. Absence from the proceedings is deficient performance as a matter of law, and prejudice is presumed.

*Green v. Arn,* 809 F.2d 1257, 1263 (6th Cir. 1987), *vacated on other grounds,* 484 U.S. 806 (1987), *after remand,* 839 F.2d 300 (6th Cir. 1988). The crucial inquiry, then, is whether Dresbach's attorney was indeed absent during a "critical" stage of

-30-

the trial.

The Sixth Circuit has stated that the return of a supplemental jury instruction is a critical stage of a criminal proceeding. *French v. Jones,* 282 F.3d 893, 898 (6th Cir. 2002), *vacated on other grounds by Jones v. French,* 535 U.S. 1109 (2002), *after remand, French v. Jones,* 332 F.3d 430 (6th Cir. 2003) (citing *Rogers v. United States,* 422 U.S. 35 (1975); *Shields v. United States,* 273 U.S. 583 (1927); and *Curtis v. Duval,* 124 F.3d 1, 4 (1st Cir. 1997)). In *Green,* the Court held that the absence of counsel during the taking of evidence on the defendant's guilt was prejudicial *per se,* warranting the circumvention of harmless error analysis. *Green,* 809 F.2d at 1263. The Court proposed several circumstances under which harmless error analysis might apply to attorney absence: preliminary hearings, jury deliberations, and return of the verdict. *Id* The discussion of trial exhibits which have already been admitted is a ministerial function which this Court equates to preliminary hearings and the return of the verdict, rather than the giving of a supplemental jury instruction or the taking of evidence of a defendant's guilt. The critical stage is the time at which the exhibits are introduced. The Court concludes that Dresbach has not suffered prejudice *per se*; nor has he demonstrated actual prejudice as a result of extraneous matters having been submitted to the jury. Accordingly, the Court denies Dresbach's motion for new trial.

## IV. CONCLUSION

*USA v. Graham, et al.*
03-80504

Defendant Graham is not entitled to a new trial under *Brady* or Rule 33.  Nor is he entitled to relief based on the Court's re-instructing the jury, since there is no indication that the subsequent instruction impacted the verdict. Defendant Dresbach is not entitled to a *Remmer* hearing, since he has not made an offer of proof as to whether (or which) unauthorized exhibits were submitted to the jury. Dresbach is not entitled to a new trial because he was not denied counsel during a critical stage of the trial proceedings.  Therefore, Defendants' motions for new trial are hereby **DENIED.**

**IT IS SO ORDERED**.


s/**Arthur J. Tarnow**
**Arthur J. Tarnow**
**United States District Judge**

**Dated:  June 8, 2005**